Revised January 6, 1999

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 97-60574
_____


BENNIE WHITEHEAD; SUSAN WHITEHEAD, individually
and as Mother and adult next friend
of Amy Whitehead, a minor,

Plaintiffs-Appellees,

versus

FOOD MAX OF MISSISSIPPI, INC.; et al.,

Defendants,

KMART CORPORATION,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____

December 16, 1998

Before JOLLY, BARKSDALE, and BENAVIDES, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge.

A jury having found that Kmart's failure to provide adequate security for its parking lot was a cause of the abduction of Mrs. Whitehead and her daughter, and ensuing heinous criminal acts, the principal issue presented in Kmart's appeal from the judgment in this Mississippi diversity action, by which Kmart seeks a new trial, is whether, because of the Whiteheads' closing argument, the

jury was influenced by passion and prejudice in awarding damages of $3.4 million.  Concluding that the jury was so influenced, we must **REVERSE and REMAND** for a new trial on damages; we **AFFIRM** as to liability.

I.

 Mrs. Susan Whitehead and her then twelve-year-old daughter, Amy Whitehead, were abducted at knife-point from Kmart's parking lot at Beasley Road in Jackson, Mississippi, at approximately 8:30 p.m. on 18 October 1992.  The two teenage assailants, Shanta Jones and James Seaton, forced the Whiteheads into Mrs. Whitehead's vehicle.  After robbing Mrs. Whitehead of the money in her purse (totaling four dollars), the assailants drove the Whiteheads to an ATM machine and had Mrs. Whitehead make a withdrawal.  Seaton and Jones then drove the Whiteheads to a remote location where, outside the vehicle, they took turns sodomizing and raping Mrs. Whitehead; while one did so, the other kept Amy Whitehead in the vehicle. This minimal summary does not even begin to describe, capture, or convey the indignity, terror, and horror inflicted upon the Whiteheads.

 Approximately one week later, Seaton and Jones were arrested; each pleaded guilty to abduction, robbery, and rape.  They are serving 125 year sentences in state prison.

 At the end of July 1992, approximately three months before the abominable acts committed against Susan and Amy Whitehead, Kmart

2

terminated the contract for security on its large parking lot. It contracted with a new security provider; but, that service did not begin until two days after the abductions. This Mississippi diversity action is premised on the claim that Kmart's failure to provide adequate security for its parking lot was a cause of injuries to Mr. and Mrs. Whitehead and their daughter.

At trial, the Whiteheads' security expert criticized Kmart's lack of policies regarding parking lot security and opined that the lack of uniformed, armed security guards on the night of the abduction created an unsafe environment. Another of the Whiteheads' experts opined that Seaton and Jones were "power reassurance rapists", who probably chose Kmart because of its lack of security in its parking lot, and who would probably have been deterred by the presence of a uniformed security guard.

Kmart's local loss prevention manager testified regarding the measures his personnel took in the absence of the security guards, which primarily involved an unwritten requirement that a loss prevention employee, carrying a two-way radio, patrol the several acre parking lot twice an hour for five to ten minutes.

A jury found for the Whiteheads. It awarded Susan Whitehead $196,000 for past and future medical expenses and $1.5 million for past and future pain and suffering; Amy Whitehead, $100,000 for

future medical expenses and $1.2 million for past and future pain and suffering; and Bennie Whitehead, $500,000 for loss of consortium.

Post-verdict, Kmart did *not* seek judgment as a matter of law. Instead, it moved only for a new trial or, alternatively, a remittitur. The motion was denied.

## II.

As it did at trial, Kmart acknowledges readily that the crimes committed against Susan and Amy Whitehead are terrible. On the other hand, it notes, correctly, that, notwithstanding how vile the crimes were, the jury could not be improperly influenced by emotion.

Seeking only a new trial, not that we reverse and render, Kmart presents three issues: (1) whether there was a lack of evidence for the jury finding Kmart had a duty to provide private security for the parking lot (and, in conjunction, whether the jury was instructed erroneously and whether the district court committed plain error in admitting testimony); (2) whether the jury awards are excessive, including that they are a result of passion and prejudice; and (3) whether the district court properly applied Mississippi's statute allocating fault among joint tortfeasors. Of course, this being a diversity action, we apply state substantive law. *E.g., Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996).

4

A.

The plaintiff in a Mississippi negligence action has the burden of proving: "a) the *duty* owed him by the [defendant]; b) a *breach* of that duty; c) damages; and d) a causal connection between the breach and the damages, such that the breach is the *proximate cause* of his injuries". **Crain v. Cleveland Lodge**, 641 So.2d 1186, 1189 (Miss. 1994) (emphasis in original). Asserting that there was a lack of evidence on which the jury could find Kmart had a duty to provide private security, Kmart advances three bases in support: (1) that there was no evidence showing the requisite "atmosphere of violence"; (2) that the jury was misled by an instruction regarding Kmart's duty; and (3) that unobjected-to testimony prevented a fair trial.

1.

As noted, following entry of judgment, Kmart moved only for a new trial, expressly pursuant to FED. R. CIV. P. 59. It did not also move for judgment as a matter of law, pursuant to FED. R. CIV. P. 50.

Concerning the lack of evidence claim, "[a] trial court should not grant a new trial on evidentiary grounds unless the verdict is against the great weight of the evidence". **Pryor v. Trane Co.**, 138 F.3d 1024, 1026 (5th Cir. 1998) (quoting **Dotson v. Clark Equip. Co.**, 805 F.2d 1225, 1227 (5th Cir. 1986)). The district court has "sound discretion" to grant or deny new trial motions; we will

5

affirm absent "a clear showing that this discretion has been abused". *Pryor*, 138 F.3d at 1026; *see also* *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1046 (5th Cir. 1998); *Bernard v. IBP, Inc.*, 154 F.3d 259, 264 (5th Cir. 1998).

It goes without saying that review of the denial of a new trial motion is more limited than when one is granted. *Pryor*, 138 F.3d at 1026. The denial will be affirmed unless, on appeal, the party that was the movant in district court makes a "clear showing" of "'*an absolute absence of evidence to support the jury's verdict*,' thus indicating that the trial court had abused its discretion in refusing to find the jury's verdict 'contrary to the great weight of the evidence'". *Hidden Oaks*, 138 F.3d at 1049 (quoting *Dawsey v. Olin Corp.*, 782 F.2d 1254, 1261 (5th Cir. 1986)) (emphasis added).[1]

---

[1]    In stating the test for reviewing denials of new trial motions, *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998) mistakenly quotes the test used instead for reviewing judgment as a matter of law rulings: "we must affirm the verdict unless the evidence–viewed in the light most favorable to the jury's verdict– 'points so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary conclusion'". This statement is quoted from *Jones v. Wal-Mart Stores, Inc.*, 870 F.2d 982, 987 (5th Cir. 1989), which quoted *Whatley v. Armstrong World Industries, Inc.*, 861 F.2d 837, 839 (5th Cir. 1988), which quoted *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), *overruled on other grounds, Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997). The ultimate source of statement in *Pryor* is the cite to *Boeing*, in which our court discussed the test for reviewing judgment as a matter of law rulings, not for reviewing denials of new trial motions. As quoted above, the proper standard of review for denials of new trial motions is contained in *Hidden Oaks*.

In the face of the Whiteheads noting this quite narrow standard of review for the denial of a new trial motion, Kmart in its reply brief urges us belatedly to treat its new trial motion as also seeking judgment as a matter of law. Under that standard of review, we determine whether "there is no legally sufficient evidentiary basis for a reasonable jury to find for" the nonmovant. FED. R. CIV. P. 50(a). Obviously, Kmart's chances would be much improved under this standard; it is far easier to satisfy than the above-discussed requisite showing of "an *absolute absence* of evidence to support the jury's verdict". **Hidden Oaks**, 138 F.3d at 1049 (emphasis added).[2] Simply put, Kmart is trying to mix the

---

[2]    As we have noted, the standard of review for appeals from denials of a new trial is far more narrow than that for denials of judgment as a matter of law. At first blush, this appears inconsistent, given that the remedy of a new trial is far less drastic for the nonmovant than suffering judgment as a matter of law. However, the reason for the more narrow standard for review of the denial of new trial motions springs from the lower standard applied by the district court to new trial motions — it is far less demanding than that for judgment as a matter of law. As noted, the standard for the district court to grant a new trial is whether the verdict is against the great weight of the evidence. **Shows v. Jamison Bedding, Inc.**, 671 F.2d 927, 930 (5th Cir. 1982). On the other hand, the standard for granting judgment as a matter of law is whether there is a legally sufficient evidentiary basis for the jury's verdict. **Hiltgen v. Sumrall**, 47 F.3d 695, 700 (5th Cir. 1995).

The standard used by the district court for granting a new trial is lower than that for granting judgment as a matter of law because "[a] verdict can be against the 'great weight of the evidence', and thus justify a new trial, even if there is

proverbial "apples and oranges".

For starters, Kmart's attempt to switch the standard of review comes far too late. As noted, it was not urged until its reply brief (in a footnote no less). Generally, we do not address points presented for the first time in a reply brief. *See **Northwinds Abatement, Inc. v. Employers Ins.***, 69 F.3d 1304, 1308 n.3 (5th Cir. 1995); ***Conkling v. Turner***, 18 F.3d 1285, 1299 (5th Cir. 1994); ***Unida v. Levi Strauss & Co.***, 986 F.2d 970, 976 n.4 (5th Cir. 1993); ***Blumberg v. HCA Management Co., Inc.***, 848 F.2d 642, 646 (5th Cir. 1988); ***Knighten v. Commissioner of Internal Revenue***, 702 F.2d 59, 60 n.1 (5th Cir. 1983).

---

substantial evidence to support it". ***Shows***, 671 F.2d at 930. Additionally, "[t]he trial court in passing on a motion for a new trial need not take the view of the evidence most favorable to the verdict winner, [as is required in passing on motions for judgment as a matter of law,] but may weigh the evidence." ***Id.***; ***United States for the use of Weyerhaeuser Co. v. Bucon Constr. Co.***, 430 F.2d 420, 423 (5th Cir. 1970). Thus, while the district judge in ruling on a motion for judgment as a matter of law decides a pure, nondiscretionary question of law, that judge in ruling on a new trial motion "may and should exercise a sound discretion". ***Weyerhaeuser***, 430 F.2d at 423.

Again, it is because the standard for the district court to grant a new trial is less stringent and is discretionary that the more narrow abuse of discretion standard of review is applied on appeal. *See **Weyerhaeuser***, 430 F.2d at 423 (trial court uses its sound discretion in ruling on motion for new trial, and such ruling will only be reviewed upon a showing of "clear abuse of discretion"). In district court, Kmart recognized this more lenient standard utilized by district courts in ruling on new trial motions when, in its brief in support of its new trial motion, Kmart pointed out to the court that it did not have to view the evidence in the light most favorable to the Whiteheads and that it could weigh the evidence.

In any event, although here, Kmart belatedly urged the standard of review for judgment as a matter of law, it did not concomitantly seek a judgment in its favor. Instead, throughout its opening and reply briefs, it sought only a new trial. It was not until oral argument, in response to questioning about this anomaly, that Kmart finally asked that we reverse and render. Needless to say, we do not generally consider points raised for the first time at oral argument. *See United States v. Ulloa*, 94 F.3d 949, 952 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 1338 (1997); *Zuccarello v. Exxon Corp.*, 756 F.2d 402, 407-08 (5th Cir. 1985) ("[W]hen an appellant raises an issue for the first time at oral argument, the Court ordinarily will not consider it; failure to satisfy the requirements of Rule 28 constitutes a waiver of the issue"); FED. R. APP. P. 28. Obviously, a party is bound by, or limited to, the relief it seeks on appeal. FED. R. APP. P. 28(a)(7) (appellant's brief must contain "[a] short conclusion stating the precise relief sought"); *see Johnson v. New York, N.H. & H.R. Co.*, 344 U.S. 48, 54 (1952) (holding that failure to move for judgment after verdict entitled party "only to a new trial, not a judgment in its favor"); *MacArthur v. University of Texas Health Center*, 45 F.3d 890, 897 n.8 (5th Cir. 1995); *Zervas v. Faulkner*, 861 F.2d 823, 832 n.9 (5th Cir. 1988) (stating that if appellant does not move for judgment, only relief appellate court can grant is a new

9

trial); *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 548 (5th Cir. 1974).

Accordingly, while seeking only a new trial, Kmart urges, too late, that we apply a different standard of review. Of course, we, not the parties, determine the proper standard of review. *E.g., United States v. Vontsteen*, 950 F.2d 1086, 1091 (5th Cir. 1992) (en banc) ("[N]o party has the power to *control* our standard of review.... If neither party suggests the appropriate standard, the reviewing court must determine the proper standard on its own") (emphasis in original); *United States v. Milton*, 147 F.3d 414, 420 n*, *rehearing en banc denied*, 157 F.3d 905 (5th Cir. 1998); *Izzarelli v. Rexene Products Co.*, 24 F.3d 1506, 1519 n.24 (5th Cir. 1994); *United States v. Pierre*, 958 F.2d 1304 (5th Cir. 1992). For this appeal, that standard, as earlier discussed, is the absolute absence of evidence standard.

But, even assuming *arguendo*, that, for some unique circumstance, we could apply the more lenient standard belatedly urged by Kmart, this case would still *not* be the one for doing so. In belatedly urging that lenient standard, Kmart relies on *Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1315 (5th Cir. 1995), *cert. denied*, 516 U.S. 1045 (1996), in which our court allowed a new trial motion to be treated as one for judgment as a matter of law.

In *Satcher*, the appellant moved for judgment as a matter of law "at the close of the plaintiff's case and at the close of all

10

the evidence". *Id.* Kmart points out that it made such pre-verdict motions. The similarity ends there.

*Satcher* noted that the appellant also "reurged the motion for judgment" in its new trial motion and had merely "fail[ed] to style its motion correctly". *Id.* Kmart did not do so here. Contrary to its assertions, it did not merely fail to style its motion correctly; it also failed totally to request judgment as a matter of law. It requested only a new trial or remittitur. (And, as noted *supra*, in its opening brief in support of its new trial motion, it fully developed the evidentiary distinction between motions for new trials and those for judgment as a matter of law, stressing that it was seeking the former.) An appellant who fails to renew its pre-verdict motion for judgment "in the district court is not entitled to rendition of judgment in his favor on appeal, but is at most entitled to a new trial". *Id.* In short, Kmart's reliance on *Satcher* is most ill-advised, if not sanctionable.

Thus, in order to determine whether a new trial is warranted, we review Kmart's sufficiency of the evidence claims under the above discussed abuse of discretion standard. To reverse, we must find an absolute absence of evidence to support the verdict.

b.

Mississippi imposes on business owners "the duty to maintain the premises in a reasonably secure or safe condition" for business patrons or invitees. *Lyle v. Mladinich*, 584 So.2d 397, 399 (Miss.

11

1991).  This duty includes protection of patrons from the wrongful acts of third parties on the premises.

> [A]ny business which invites the company of the public must take "reasonably necessary acts to guard against the predictable risk of assaults".  A business proprietor owes a duty to those entering its premises to provide a reasonably safe place.

*Id.* (quoting *Harris v. Pizza Hut of Louisiana, Inc.*, 455 So.2d 1364, 1369 (La. 1984)) (internal citations omitted).

Whether the injuries sustained by the Whiteheads were foreseeable is the central issue; "the *foreseeability* of the injury sustained provide[s] the touchstone for liability".  *Crain*, 641 So.2d at 1189 (emphasis in original); *Malloy v. Sears, Roebuck and Co.*, 1997 WL 170313, *4 (N.D. Miss. 1997).  In this regard, the intentional criminal acts of third parties do not, by definition, relieve Kmart of liability.  *O'Cain v. Harvey Freeman and Sons, Inc.*, 603 So.2d 824, 830 (Miss. 1991).  Rather, "criminal acts *can* be intervening causes which break the causal connection with the defendant's negligent act, *if the criminal act is not within the realm of reasonable foreseeability*.... [The answer] depends upon the facts of the case and the duty which the plaintiff asserts for the particular defendant".  *Id.*  (emphasis in original).

As Kmart notes, foreseeability of the crimes at issue may arise from two sources: "1) actual or constructive knowledge of the assailant's violent nature, or 2) actual or constructive knowledge

12

that an *atmosphere of violence* exists [on the premises]". ***Grisham v. John Q. Long V.F.W. Post***, 519 So.2d 413, 416-17 (Miss. 1988) (emphasis added); ***Crain***, 641 So.2d at 1189. It is undisputed that the assailants' violent nature was unknown to Kmart; therefore, foreseeability rests on whether "an atmosphere of violence" existed. Asserting that there was a "complete lack of evidence that an 'atmosphere of violence' existed in the Kmart parking lot", Kmart claims it owed no duty to the Whiteheads to provide security there.

Kmart maintains that the 18 October 1992 crimes were not reasonably foreseeable in the light of the relative lack of crime at Kmart. The Whiteheads introduced evidence of several prior crimes at the parking lot, which had been reported to the police: (1) in July 1991, a customer hit another customer's car with a stick and then attempted to hit him with the stick; (2) in October 1991, a man drove by a customer and snatched her purse out of her shopping cart; (3) in March 1992, two men drove by a customer and grabbed her purse; (4) in April 1992, a man was robbed in his car at gunpoint by another man whom he had recognized and had agreed to drive home; (5) in May 1992, a customer was nearly knocked to the ground as her purse was snatched; (6) in June 1992, a man grabbed a customer's purse and jumped into a car, dragging the customer to the ground; and (7) in October 1992, just days before the abductions, a purse was snatched.

13

As noted, Kmart contends that this evidence equates, instead, with "a complete lack of evidence that an 'atmosphere of violence' existed in the Kmart parking lot". We disagree.

*Lyle* involved facts similar to those at hand. A customer at a nightclub was abducted in his car at gunpoint, robbed, beaten, and left in his trunk. *Lyle*, 584 So.2d at 398. The customer sued the nightclub owners; but, the trial court granted summary judgment, finding a lack of proximate cause. *Id.*

In reversing, the Mississippi Supreme Court noted that there was evidence of several crimes against the person in the area of the nightclub; and that, although there was no security on the night of the abduction, there had been security in the past. *Id.* at 399. The court held that whether the presence of security on the night in question would have prevented the customer's injuries presented a jury issue, stating that "the jury must determine whether the [defendants'] discontinuance of its previous policy of hiring security personnel to patrol the parking lot constituted a breach of duty and, if so, whether this breach proximately caused or contributed to [plaintiff's] injuries". *Id.* at 400.

Likewise, we cannot say that there was an absence of evidence to show that Kmart's discontinuance of private security guards in its parking lot was a breach of duty. The Whiteheads introduced several incidents of crimes against the person that had occurred on the parking lot, including an armed robbery and several purse

14

snatchings, two of which nearly injured the victims involved. In *Lyle*, the court apparently concluded that the evidence of crimes against the person in the vicinity of the premises and the presence of security in the past were enough to make a jury issue. *Id.* at 399. Likewise, we cannot say that there was no evidence from which the jury could have found that the occurrence of these crimes made the injury to the Whiteheads foreseeable.

Further, we note that most of these prior crimes occurred while Kmart employed outside security, and the Whiteheads' security expert testified that it was impossible to know how many crimes would have occurred in the absence of that security. In light of the fact that several crimes occurred while there was security on the lot, there was no lack of evidence from which the jury could find that Kmart's discontinuance of security for 82 days was a breach of duty.

Kmart relies on *Kelly v. Retzer & Retzer, Inc.*, 417 So.2d 556 (Miss. 1982). There, the relatives of a young man shot in a McDonald's parking lot sued the owners for not providing adequate security. *Id.* at 557. The plaintiffs introduced evidence of 28 reported crimes in the parking lot in the previous three years, including "three incidents of vandalism, two assaults, one attempted auto theft, one auto theft, one attempted fraud, an armed robbery in a restroom, one strong armed robbery of a child by a fifteen year old boy, one simple assault, and one unknown

15

complaint". *Id.* at 559. Despite this evidence, the Mississippi Supreme Court upheld the peremptory instruction in favor of the defendant, holding that it was not negligent and that the crime was not foreseeable. *Id*. at 561, 562.

*Kelly* is distinguishable from this case. In *Kelly*, the person shot was involved in an altercation with others in the parking lot and was shot as he was heading toward his trunk, apparently to retrieve a gun. *Id.* at 558-59. In the light of this, the Mississippi Supreme Court found a "voluntary interference into an already hostile situation [that] was an independent and intervening cause which could not have been reasonably foreseen or prevented by McDonald's". *Id.* at 562. There is no evidence that Susan and Amy Whitehead acted in any manner to invite the harm inflicted upon them.

Further, in *Kelly*, there was undisputed evidence that an assistant manager was required to patrol the parking lot every half hour, that loitering customers were advised to buy something or leave if they remained in the lot for two to three minutes, and that the assistant manager immediately called police when he learned of the altercation. *Id*. at 562. Here, there was conflicting evidence at trial regarding whether the loss prevention personnel actually patrolled the parking lot twice an hour, and the evidence indicated that no anti-loitering policy existed.

16

This case is also distinguishable from *Crain*, where the plaintiff sued the Moose Lodge for an assault in its parking lot. The court first held that Crain's injury was not foreseeable because there had been only two reports of crime on the premises in the past year (both involving property crimes) and only 11 crimes against the person in the vicinity of the Moose Lodge in the past five years. *Crain*, 641 So.2d at 1192. Further, the court held that the plaintiff did not show proximate cause between the lack of lighting in the Moose Lodge parking lot and his injuries. *Id*.

Here, however, the Whiteheads introduced evidence of several prior crimes against the person occurring in the Kmart parking lot. Further, the Whiteheads' security and rape experts testified that the presence of uniformed security guards probably would have deterred the assailants. It is within the province of the jury to decide how much weight to give this expert testimony, *Newport Ltd. v. Sears, Roebuck & Co.*, 6 F.3d 1058, 1069 (5th Cir. 1993), and we cannot say there was an absence of evidence for the jurors to have found that this crime was foreseeable or that the lack of security in the lot was a proximate cause of the injuries to the Whiteheads.

In the light of the evidence introduced by the Whiteheads, there was not an absolute absence of evidence to support the jury's verdict. Thus, concerning Kmart's lack of evidence claim, the district court did not abuse its discretion in denying Kmart's new trial motion.

2.

In conjunction with the foregoing evidentiary challenge, Kmart asserts that "[t]he jury may have overlooked the *lack* of evidence of any 'atmosphere of violence' because of the jury charge". (Emphasis added.)  In this regard, it points to the following objected-to jury instruction, regarding Kmart's ability to rely upon the local police:

> Therefore, you are instructed that the defendant, Kmart Corporation, is not entitled to rely upon and cannot rely upon law enforcement agencies such as the Jackson Police Department and/or Hinds County Sheriff's Department to discharge its nondelegable duty to keep the Kmart store and parking lot in a reasonably safe and secure condition.

Kmart asserts that this is an incorrect statement of the law, misled the jury, and prejudiced Kmart, resulting in reversible error.

As stated in *Davis v. Avondale Indus., Inc.*, 975 F.2d 169, 174-75 (5th Cir. 1992):

> On appeal, the charge must be considered as a whole, and so long as the jury is not misled, prejudiced, or confused, and the charge is comprehensive and fundamentally accurate, it will be deemed adequate and without reversible error.  This Court will only reverse when the charge as a whole leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations.
>
> Nevertheless, a defendant is "entitled to the submission of an appropriate instruction on its theory of defense," and we have not hesitated to reverse where, despite proper

18

> request and objection, the charge fails to in any adequate way to present a theory of defense, or recovery, properly raised by the evidence.

(Internal citations omitted.) *See also **National Union Fire Ins. Co. v. Cagle,*** 68 F.3d 905, 909 (5th Cir. 1995) (quoting ***Bender v. Brumely***, 1 F.3d 271, 276 (5th Cir. 1993)); ***Roberts v. Wal-Mart Stores, Inc.***, 7 F.3d 1256, 1258 (5th Cir. 1993) ("The function of the reviewing court with respect to instructions is to satisfy itself that the instructions show no tendency to confuse or mislead the jury with respect to the applicable principles of law").

Kmart maintains that the instruction misinformed the jury, claiming that the instruction told the jury that Kmart could not rely on the police and had to provide its own security; and that, because "[t]he jury was already misled by [Whiteheads'] counsel's referral to the so-called 'gap' in security services to conclude a duty to provide security guards existed[,] this jury instruction sealed Kmart's fate on the critical legal issue". In making this claim, Kmart relies on ***Kelly***, in which the court stated that it was "of the opinion the responsibility of enforcing the law is on the government chosen by the people of the area and does not necessarily rest upon the business involved". ***Kelly***, 417 So.2d at 563.

But, after the challenged instruction, the district court added the following:

So you are instructed that a retailer is not obligated to hire a security guard or to take other precautions against a crime unless it reasonably should expect that ordinary police protection is inadequate. The duty of a store owner, therefore, does not extend to the protection of customers from the criminal acts of third parties unless the risk of this crime on the premises was sufficiently and reasonably foreseeable to require special protection through security measures.

In the light of the instruction as a whole, Kmart's contention that the instruction implied that Kmart was *required* to provide private security is unavailing. The district court properly instructed the jury that it was to find a duty to provide private security *only* if the jury found first that the attack on Susan and Amy Whitehead was reasonably foreseeable.

Further, the Mississippi Supreme Court addressed a similar issue in ***McWilliams v. City of Pascagoula***, 657 So.2d 1110 (Miss. 1995), in which the plaintiffs challenged a jury instruction that "the responsibility of enforcing the law and protecting persons from criminal acts rests with the police department". ***Id.*** at 1112. The court held that this instruction, coupled with the denial of an instruction on premises liability, was erroneous because it "left the jury with the impression that the [premises owner] had no obligation to provide for [the plaintiff's] safety". ***Id.*** This further contradicts Kmart's contention that the instruction misstated Mississippi law.

Accordingly, the instruction, taken as a whole, did not mislead the jury with regard to Kmart's ability to rely on the police to keep its parking lot safe for its customers. Taken as a whole, the instruction correctly states the law in Mississippi that a premises owner has a duty to keep its invitees safe from the reasonably foreseeable criminal acts of third parties.

3.

Finally, similar to its complaint about the jury instruction, Kmart asserts that, by the introduction of inadmissible hearsay evidence, the jury was misled regarding Kmart's duty. The Whiteheads' security expert testified that a supervisor with the company that had provided security for Kmart had warned Kmart, prior to the crimes in this case, not to discontinue the security because of the crime in the parking lot. Kmart did not object at trial; therefore, as Kmart acknowledges, we are limited to reviewing only for plain error. FED. R. EVID. 103(d); *Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 710 (1997), *rehearing denied*, 137 F.3d 1353 (5th Cir. 1998).

Kmart maintains that the repeated references to the alleged warning by the Whiteheads' security expert, and by their counsel during closing argument, substantially affected its right to a fair trial. Although recognizing that experts may rely upon hearsay that is trustworthy, FED. R. EVID. 703; *Christopherson v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991)(en banc),

21

*overruled on other grounds*, **Daubert v. Merrell Dow Pharmaceuticals, Inc.**, 509 U.S. 579, 587 n.5 (1993), Kmart asserts that this hearsay was not reliable because it resulted from an interview conducted by the Whiteheads' counsel.

"[U]nobjected-to hearsay may be considered by the trier of fact for such probative value as it may have." **Peaches Entertainment v. Entertainment Repertoire**, 62 F.3d 690, 694 (5th Cir. 1995) (quoting **Flores v. Estelle**, 513 F.2d 764, 766 (5th Cir. 1975)). In reviewing such unobjected to evidence only for plain error, we have discretion to correct an error if, "when examined in the context of the entire case, [it] is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity, or public reputation or judicial proceedings". **Peaches Entertainment**, 62 F.3d at 694 (citation omitted).

Even assuming error, it falls far short of satisfying the standard for plain error reversal. Further, we are not unmindful of the apparently conscious choice that Kmart's counsel made at trial, once the testimony at issue was given, of choosing to attack its credibility, rather than object to its introduction and request a curative instruction. As noted, this choice has limited us to plain error review. *Cf.* **United States v. Handly**, 591 F.2d 1125, 1128 (5th Cir. 1979) ("Where, however, the record indicates that defense counsel's failure to object to an improper comment was part

22

of his defense strategy, then the defendant will not be heard to claim he was prejudiced by the prosecutor's indiscretions").

In sum, in regard to Kmart's asserted bases for a new trial on liability, there was not an absence of evidence to prove that Kmart breached its duty to the Whiteheads; the challenged jury instruction was not inaccurate; and the admission of the challenged testimony did not constitute plain error. Accordingly, as to liability, the district court did not abuse its discretion in denying Kmart's new trial motion.

## B.

Maintaining that the damages of $3.4 million are excessive, Kmart advances two independent bases: that they shock the judicial conscience; and, that they are the result of passion and prejudice, caused by improper closing argument by the Whiteheads' counsel. Because we conclude that the jury was so influenced by passion and prejudice, we do not reach whether the awards are otherwise excessive.

## 1.

The denial of a new trial on the issue of damages is reviewed for abuse of discretion. *E.g., Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 375 (5th Cir. 1989); *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 781 (5th Cir. 1983). A new trial, rather than a remittitur, is the appropriate remedy when a jury award results from passion and prejudice. *E.g., Caldarera*, 705 F.2d at 782. In

that regard, Kmart asserts, *inter alia*, that, during closing argument, one of the Whiteheads' counsel emphasized improperly Kmart's status as an out-of-state corporation; invoked "Golden Rule" arguments; and made other "blatantly prejudicial" comments.

"The propriety of an argument is a matter of federal trial procedure under **Byrd v. Blue Ridge Rural Electric Cooperative, Inc.**, 356 U.S. 525 (1958), and, therefore, in a diversity case, subject to federal rather than state law." **Westbrook v. General Tire and Rubber Co.**, 754 F.2d 1233, 1239-40 (5th Cir. 1985). No doubt, final arguments must be forceful. And, generally, counsel are allowed a "reasonable latitude" in making them. **Edwards v. Sears, Roebuck and Co.**, 512 F.2d 276, 283 (5th Cir. 1975). "When a closing argument is challenged for impropriety or error, the entire argument should be reviewed within the context of the court's rulings on objection, the jury charge, and any corrective measures applied by the trial court." **Westbrook**, 754 F.2d at 1238.

Our task is complicated by Kmart's failure to object to almost all of the statements now challenged. Although we may review such challenges even where no contemporaneous objection was made, **Liner v. J.B. Talley and Co., Inc.**, 618 F.2d, 327, 329 (5th Cir. 1980), we are, of course, extremely reluctant "to address for the first time on review errors which the trial court was not given the opportunity to consider and correct". **Edwards**, 512 F.2d at 286, 288; **Liner**, 618 F.2d at 330 (expressing "extreme reluctance to

24

grant relief in the absence of an objection"). This extreme reluctance is grounded in several obvious reasons. Among other things, it is in keeping with the great deference we accord the decision by the trial judge, who was present and heard the evidence, to deny a new trial motion. *Gautreaux v. Scrulock Marine, Inc.*, 84 F.3d 776, 783 (1996), *rev'd on other grounds*, 107 F.3d 331 (5th Cir. 1997)(en banc); *Guaranty Service Corp. v. American Employers' Ins. Co.*, 893 F.2d 725, 729 (5th Cir. 1990) (decision by trial judge to grant or deny new trial not lightly reversed).

At least a few pertinent objections were made during the Whiteheads' closing argument, as discussed *infra*. And, for the unobjected to, but now challenged comments, consistent with plain error review, we must reverse when necessary to preserve "substantial justice". FED. R. CIV. P. 61; *Hall v. Freese*, 735 F.2d 956, 963 (5th Cir. 1984); *Westbrook,* 754 F.2d at 1241; *Edwards*, 512 F.2d at 286. In sum, in order to serve "the interests of justice", we must abandon our deference for the district court's decision. *Westbrook*, 754 F.2d at 1241.

Obviously, awards influenced by passion and prejudice are the antithesis of a fair trial. This case was fertile ground for such bias. By its very nature, it was extremely emotional. Indeed, part of the damages involved "emotional distress". But, this did not permit appeals to emotion — quite the contrary. In cases of

25

this type, counsel must be unusually vigilant and take the greatest care to avoid and prevent such appeals, in order to keep the verdict from being infected by passion and prejudice. Unfortunately, the Whiteheads' counsel did just the opposite. Our close and repeated review of the Whiteheads' closing argument convinces us that it caused the verdict to be so influenced.

First, the Whiteheads' counsel made statements that appealed to local bias. On numerous occasions, he reminded the jury that Kmart is a national, not local, corporation, with its principal place of business in Troy, Michigan. And, he contrasted that with his status as a Mississippi resident and, implicitly, his clients' similar status: "*as a little old lawyer down here in Mississippi, to take on a national corporation*, I knew I had to bring in the best experienced person in security that I knew"; and "[n]ow when I, as a lawyer *here in Mississippi*, bring a legal action against a *national corporation* -- having done this a few years -- they are tough cases". (Emphasis added.)

Another example of the emphasis on Kmart being an out-of-state corporation follows:

> The problem is — *way up there in Troy, Michigan* — *way up there in Troy, Michigan*, where they decide to write a two or three inch thick loss prevention manual, they don't think about the customers' safety and security in the parking lot. Because they are more concerned about profits and not people.

(Emphasis added.)  That this blatant appeal to sectionalism would be made in a federal court in this day and time is nothing short of amazing.

This repeated emphasis on Kmart being a national, not local, corporation was exacerbated by counsel's shameless refusal to abide by the district court's sustaining Kmart's objections to counsel's comments concerning Kmart not presenting proof about its security measures through non-local witnesses.  As noted, Kmart presented such proof through the loss prevention manager at the Kmart store in question.  He also served as Kmart's corporate representative at trial.  Consistent with emphasizing that Kmart was not a local corporation, the Whiteheads' counsel stated:

> It bothers me and I hope it bothers you, that if what I presented to you in this case about the corporate negligence in security was not true, why didn't we ... see someone from the national company come into this courtroom and try to explain their conduct.

Immediately after the court sustained Kmart's objection and gave a curative instruction (that a defendant has no obligation to produce any witnesses), the Whiteheads' counsel returned to this tactic, in total defiance of the district court's ruling, until counsel was interrupted by the same objection.  Before being interrupted, he stated: "We heard no one from the national corporation — the national corporation come here and explain why—".  The district court reminded the Whiteheads' counsel that it had sustained the objection and gave another curative instruction.

27

In his rebuttal closing argument, and notwithstanding the court's having earlier sustained Kmart's objections, the Whiteheads' counsel returned to this improper tactic:

> [Kmart's] whole ploy in this case was to come in and attack the plaintiffs' case, attack their witnesses, be critical of them and have a nice man from Jackson [Kmart's local loss prevention manager/corporate representative] and a nice, good, mild-mannered lawyer trying to make you think: Well, they are just real nice folks, and they just didn't do anything wrong.
>
> ....
>
> Shame on Kmart. *Shame on the corporation for not sending representatives here to testify about why they don't have a policy. Shame on them for having a local man sit here and take the fall....*

(Emphasis added.) Once again, the district court sustained the objection by Kmart.

In short, counsel twice violated the court's ruling on Kmart's objection. Counsel's continued improper references to Kmart using a local representative/witness served to do nothing but appeal to prejudice and passion.[3] It goes without saying that such conduct

---

[3] Although we are reviewing a cold record, the heated, emotional atmosphere at trial is reflected by the Whiteheads' counsel's response, during his rebuttal closing argument, to Kmart's objection, in which it noted to the court, consistent with the court's earlier ruling on the similar objection, that, had they felt it important, the Whiteheads could have introduced testimony by a non-local Kmart representative. Instead of responding to the court, as the court had had to instruct counsel earlier in the trial, the Whiteheads' counsel responded to Kmart's counsel concerning his statement that the Whiteheads could have offered non-local Kmart testimony; the Whiteheads' counsel responded, "And

and comments have no place in a federal court. Worse still, they prevent a fair trial.

"Arguments which invite a jury to act on behalf of a litigant become improper 'conscience of the community' arguments when the parties' relative popular appeal, identities, or geographical locations are invoked to prejudice the viewpoint of the jurors". *Guaranty Service Corp.*, 893 F.2d at 729. Again, such arguments distract the jury from its "sworn duty to reach a fair, honest and just verdict according to the facts and evidence presented at trial". *Westbrook*, 754 F.2d at 1238. When such arguments are used, as here, against out-of-state parties, they "carry the potential of substantial injustice". *Id.* at 1239.

Counsel made other highly prejudicial statements during closing argument. For example, he stated that Susan Whitehead's last thought before death would be of the rapists, and that Amy Whitehead needed to be compensated to avoid thoughts, on her wedding night, of her mother's rape. Neither person so testified.

---

so could you".

In sustaining the objection, the court stated it would take up another matter later. While the jury was deliberating, the district court sanctioned the Whiteheads' counsel $1,000 for violating its earlier warning to respond to the court, not to counsel. (That counsel would even need to be instructed to respond to the court, not to opposing counsel, speaks volumes.) One of the reasons presented to the district court by the Whiteheads' counsel against imposing the sanction was that "[t]his is a very emotional trial". (Kmart counsel also urged that the sanction not be imposed.) As noted, it is in such emotional trials that counsel must keep emotion within its proper bounds.

Nor is this fair comment on the evidence. As another example, counsel, again going outside the evidence and again not engaging in fair comment on it, told the jury that, other than to testify, "the Whiteheads have not been in the courtroom. And you know why. It's just too painful for them to listen-listen to the horrors and the events of what happened in the liability testimony".

Such statements could serve no purpose other than to inflame the passions of the jury to return large awards. They are similar to those found to be prejudicial in *Edwards*, where, during closing argument in a wrongful death case, counsel, *inter alia*, invoked images of the decedent's children crying at the grave and waiting for their father on the porch steps. *Edwards*, 512 F.2d at 285-86.

Finally, counsel engaged in an improper "Golden Rule" argument. "This court has forbidden plaintiff's counsel to explicitly request a jury to place themselves in the plaintiff's position and do unto him as they would have him do unto them." *Stokes v. Delcambre*, 710 F.2d 1120, 1128 (5th Cir. 1983). Such arguments encourage the jury to "decide the case on the basis of personal interest and bias rather than on the evidence". *Loose v. Offshore Navigation, Inc.*, 670 F.2d 493, 496 (5th Cir. 1982) (quoting *Ivy v. Security Barge Lines, Inc.*, 585 F.2d 732, 741 (5th Cir. 1978), *rev'd on other grounds*, 606 F.2d 524 (5th Cir. 1979)(en banc)).

The Whiteheads' counsel stated:

> The incident took approximately two hours from when they were abducted to when they were released. And I calculated it, and that's 7,200 seconds. And I want for you to just for a couple of seconds to see–when I say start, that's ten seconds. Ten seconds.
>
> *And can you imagine how it would feel to have a knife in your side or a knife on your leg or a pistol at your neck for ten seconds*?

(Emphasis added.) Even assuming he was not explicitly invoking the Golden Rule, counsel was clearly inviting the members of the jury to put themselves in the place of the plaintiffs when deciding damages.

Of course, we need not find that each statement, taken individually, was so improper as to warrant a new trial. Rather, taken as a whole, these comments prejudiced the jury's findings with respect to damages. Even though most of the challenged statements were not objected to, substantial injustice would result, contrary to Rule 61, were we to affirm the awards.

That the awards were improperly influenced by passion and prejudice is indicated by their size. Without deciding that the awards are excessive, we note that, at the very least, they are at the high end of the spectrum for such damages. This large verdict, when accompanied by counsel's improper arguments, further indicates that the jury was influenced by the prejudicial statements. *See Westbrook*, 754 F.2d at 1241 ("[A]ppeals to local bias against an outsider are prejudicial, and a large verdict accompanied by such

31

appeals leads us to conclude they had an influential impact on the jury's deliberations").[4]

### 2.

As noted, a new trial, rather than remittitur, is the appropriate remedy when a jury award results from passion and prejudice. *Caldarera*, 705 F.2d at 782. Here, the new trial need be only on damages. This is appropriate where the "factual questions relating to damages are sufficiently distinct and independent of those questions pertaining to liability". *Westbrook*, 754 F.2d at 1242. That is the situation here. Additionally, Kmart does not claim that the entire *verdict* was influenced by passion and prejudice, only the damages. And, as previously noted, the damage awards were high; this also indicates the jury's strong belief that Kmart was liable. *See id*. ("[T]he extremely high amount of the award ... suggests the jury had little

---

[4] Again, we are most cognizant of the fact that the trial judge is in a far, far better position than we to gauge the effect of closing arguments; he is present and hears the statements, while we are limited to the cold record. *See Caldarera*, 705 F.2d at 782 ("Our review is not only hindsight, but is based on a written record with no ability to assess the impact of the statement on the jury or to sense the atmosphere of the courtroom"). However, our insight into what took place during closing argument is sharpened and illumined by the actions by the Whitehead's counsel on appeal-specifically, extremely inappropriate appeals to emotion at oral argument, and, even while acknowledging the exclusion of certain evidence offered by the Whiteheads (concerning Kmart's duty to provide security), nevertheless presenting that excluded evidence in his brief.

doubt that [the defendant] should be held responsible for [causing the plaintiff's] injuries").

C.

Finally, even though we are remanding for a new trial on damages, it is appropriate now to address Kmart's contentions regarding allocation of fault under Mississippi's statute limiting joint and several liability, MISS. CODE ANN. § 85-5-7. Under subsection (3), with certain exceptions, a joint tortfeasor's liability is limited to "the amount of damages allocated to him in direct proportion to his percentage of fault". § 85-5-7 (3).

Of course, we review questions of statutory interpretation *de novo*. *E.g.*, **Spacek v. Maritime Ass'n**, 134 F.3d 283, 288 (5th Cir. 1998).

The district court denied Kmart's pretrial request for specific mention of the assailants in the verdict form under subsection (7) of § 85-5-7 (requiring that "the trier of fact shall determine the percentage of fault for each party alleged to be at fault"). The order did permit Kmart to assert an "empty chair" defense at trial under the "percentage of fault" language of subsection (3). The jury instructions, however, contained no "percentage of fault" language. (Earlier, Kmart had moved to join the assailants as co-defendants; but, it withdrew the motion.)

Section 85-5-7 became effective 1 July 1989, during a wave of legislative modification of joint-and-several liability in favor of

allocation schemes among tortfeasors. 1989 Miss. Laws Ch. 311; *e.g.*, Kathleen M. O'Connor and Gregory P. Sreenan, *Apportionment of Damages: Evolution of a Fault-Based System of Liability for Negligence*, 61 J. Air Law & Comm. 365, 374-81 (1996). This legislative activity followed the shift from contributory to comparative negligence tort regimes. *E.g.*, **id**. at 368-73. Mississippi was first in this trend, adopting a pure comparative negligence statute in 1910. MISS. CODE ANN. § 11-7-15; KEETON ET AL., PROSSER AND KEETON ON TORTS 471 (5th ed. 1984).

Both modifications changed all-or-nothing regimes to ones dividing liability based on respective fault: comparative negligence so dividing liability between the plaintiff and defendant, allocation so dividing liability among defendants. Over 35 States now use comparative negligence and allocate liability among defendants rather than imposing unqualified joint-and-several liability. Carol A. Mutter, *Moving to Comparative Negligence in an Era of Tort Reform: Decisions for Tennessee*, 57 Tenn. L. Rev. 199, 203 (1990).

Legislative history and subsequent judicial interpretation shed little light on the contours of allocation in Mississippi. Only seven majority opinions in either federal or Mississippi state court mention § 85-5-7 at all; none address our issues squarely. Two federal district courts have faced issues tangential to our inquiry. *See **Chism v. Burlington Northern Railroad Co.***, 1996 WL

34

408907, *3 (N.D. Miss. 1996) (unpublished) (applying § 85-5-7(3) to support the joinder of other defendants, resulting in the loss of diversity and remand to state court); *White v. Esmark Apparel, Inc.*, 788 F. Supp. 907, 908-09 (N.D. Miss. 1992) (declining to allow "phantom party" pursuant to allocation under § 85-5-7(3)). Remaining opinions address other subsections. *See Mississippi Transp. Comm'n v. Jenkins*, 699 So.2d 597, 600 (Miss. 1997) (applying § 85-5-7(5) and reaffirming that the section does not affect sovereign immunity); *Midsouth Rail Corp. v. Citizens Bank & Trust Co., Inc.,* 697 So.2d 451, 452 (Miss. 1997) (contribution rules of § 85-5-7(4) do not apply to damages incurred before its effective date); *Adkinson v. International Harvester Co.*, 975 F.2d 208, 218 n.7 (5th Cir. 1992) (same); *Stringfellow v. Reed*, 739 F. Supp. 324, 326 (S.D. Miss. 1990) (disallowing the use of § 85-5-7 to obtain a contribution from an employer immune under workman's compensation law)*; Garriga v. Nationwide Mut. Ins. Co.*, 813 F. Supp. 457, 463 (S.D. Miss. 1993) (referring briefly to § 85-5-7's "joint tortfeasor" locution in remaining areas of joint and several liability).

Four concurrences and dissents also refer to the section. *See Robles By and Through Robles v. Gollott and Sons Transfer and Storage, Inc.*, 697 So.2d 383, 386 (Miss. 1997) (Prather, P.J., concurring) (noting question whether § 85-5-7 compels contribution absent a joint judgment); *Mississippi Power & Light Co. v. Lumpkin*,

1998 WL 80164, *28 (Miss. 1998) (Smith, J., dissenting in part) (arguing for an application of § 85-5-7 to allow assessment of a plaintiff's negligence); *King v. City of Jackson*, 667 So.2d 1315, 1317-18 (Miss. 1995) (Banks, J., dissenting) (mentioning § 85-5-7 in the course of explaining when plaintiff driver's negligence could be considered); *Sweeney v. Preston*, 642 So.2d 332, 343 (Miss. 1994) (Hawkins, C.J., dissenting) (noting that use of § 85-5-7 might cause a conflict of interest).

The section provides:

> (1) As used in this section "fault" means an act or omission of a person which is a proximate cause of injury or death to another person or persons, damages to property, tangible or intangible, or economic injury, including but not limited to negligence, malpractice, strict liability, absolute liability or failure to warn. *"Fault" shall not include any tort which results from an act or omission committed with a specific wrongful intent.*

> (2) Except as may be otherwise provided in subsection (6) of this section, in any civil action based on fault, the liability for damages caused by two (2) or more persons shall be joint and several only to the extent necessary for the person suffering injury, death or loss to recover fifty percent (50%) of his recoverable damages.

> (3) Except as otherwise provided in subsections (2) and (6) of this section, in any civil action based on fault, the liability for damages caused by two (2) or more persons shall be several only, and not joint and several and a joint tort-feasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault. In assessing percentages

of fault an employer and the employer's employee or a principal and the principal's agent shall be considered as one (1) defendant when the liability of such employer or principal has been caused by the wrongful or negligent act or omission of the employee or agent.

(4) Any defendant held jointly liable under this section shall have a right of contribution against fellow joint tort-feasors. A defendant shall be held responsible for contribution to other joint tort-feasors only for the percentage of fault assessed to such defendant.

(5) Nothing in this section shall eliminate or diminish any defenses or immunities which currently exist, except as expressly noted herein.

(6) Joint and several liability shall be imposed on all who consciously and deliberately pursue a common plan or design to commit a tortious act, or actively take part in it. Any person held jointly and severally liable under this section shall have a right of contribution from his fellow defendants acting in concert.

(7) In actions involving joint tort-feasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault.

(8) Nothing in this section shall be construed to create a cause of action. Nothing in this section shall be construed, in any way, to alter the immunity of any person.

MISS. CODE ANN. § 85-5-7 (emphasis added).

The general rule is stated in subsection (3): "[A] joint tort-feasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault." § 85-5-7(3).

Exceptions for common schemes and for recovery of at least 50 percent of the damages are stated in subsections (6) and (2).

At issue is the application of the allocation in subsection (3) to Seaton and Jones, who engaged in the criminal conduct against Susan and Amy Whitehead. Because Seaton and Jones are intentional tortfeasors and non-parties in this action, we are faced with two separate issues of application of § 85-5-7(3). Each issue concerns the total of which the defendant's "percentage of fault" is a percentage: does it include intentional torts, and does it include the fault of non-parties? No authority need be cited for the rule that the starting point for answering these questions is the plain language of the statute.

We need not answer the second question, because the definition of "fault" in subsection (1) provides a clear and immediate answer to the first question: "fault" does *not* include intentional torts. The words of the allocation requirement in subsection (3), "in direct proportion to his percentage of *fault*" (emphasis added), therefore preclude allocation of damages between a negligent and an intentional tortfeasor. Kmart's percentage of "fault" here is 100 percent, because intentional tortfeasors Seaton and Jones have no "fault" as defined by subsection (1).

Our reading, mandated by the plain wording of the statute, is confirmed by decisions from at least 15 other States that have addressed apportionment of fault between a negligent defendant and

38

an intentional tortfeasor. Arizona, California, Colorado, Connecticut, Kentucky, New Jersey, New Mexico, New York, and Utah allow such comparison. *See Hutcherson v. City of Phoenix*, 961 P.2d 449, 451-53 (Ariz. 1998); *Weidenfeller v. Star & Garter*, 2 Cal. Rptr.2d 14, 16 (Ct. App. 1991); *Pamela B. v. Hayden*, 31 Cal. Rptr.2d 147, 159-160 (Ct. App. 1994); *Martin v. United States*, 984 F.2d 1033, 1039 (9th Cir. 1993); *Harvey v. Farmers Insurance Exchange,* 1998 WL 679864, *3-*4 (Colo. Ct. App. 1998); *Bhinder v. Sun Company, Inc.*, 717 A.2d 202, 208-212 (Conn. 1998); *Roman Catholic Diocese of Covington v. Secter*, 966 S.W.2d 286, 291 (Ky. Ct. App. 1998); *Blazovic v. Andrich*, 590 A.2d 222, 230 (N.J. 1991); *Steele v. Kerrigan*, 689 A.2d 685, 690-691 (N.J. 1997); *Reichert v. Atler*, 875 P.2d 379, 381 (N.M. 1992); *Barth v. Coleman,* 878 P.2d 319, 321-22 (N.M. 1994); *Siler v. 146 Montague Assocs.*, 652 N.Y.S.2d 315, 319-20 (App. Div. 1997) (but see *Morales v. County of Nassau*, 667 N.Y.S.2d 239, 240 (Sup. Ct. 1997), distinguishing *Siler* based on "public policy considerations"); *Field v. Boyer Company, L.C.*, 952 P.2d 1078, 1080 (Utah 1998). Louisiana has a case-by-case rule. *Veazey v. Elmwood Plantation Assocs.*, 650 So.2d 712, 717-19 (La. 1995). North Dakota decided against comparison under an old law, but new legislation may change the result. *McLean v. Kirby Co.*, 490 N.W.2d 229, 244 (N.D. 1992). Florida, Kansas, Tennessee, and Washington have held that the responsibility of

intentional and negligent tortfeasors may not be compared. *Merrill Crossings Associates v. McDonald,* 705 So.2d 560, 562-63 (Fla. 1997); *Kansas State Bank & Trust Co. v. Specialized Transportation Services, Inc.*, 819 P.2d 587, 605-06 (Kan. 1991); *Gould v. Taco Bell,* 722 P.2d 511, 516-17 (Kan. 1986); *M. Bruenger & Co., Inc., v. Dodge City Truck Stop, Inc.,* 675 P.2d 864, 869 (Kan. 1984); *Turner v. Jordan*, 957 S.W.2d 815, 821-23 (Tenn. 1997); *Welch v. Southland Corp.*, 952 P.2d 162, 165 (Wash. 1998).

None of the statutes construed to allow comparison between negligent and intentional tortfeasors, however, have had such an explicit definition of "fault" as does § 85-5-7(1). *See* ARIZ. REV. STAT. § 12-2506(A), 12-2506(F)(2)(1997) (allocating liability based on "defendant's percentage of fault"; defining "fault" as "an actionable breach of legal duty"); CAL. CIV. CODE § 1431.2 (1997) (referring to "defendant's percentage of fault", without defining "fault"); COLO. REV. STAT. § 13-21-111.5(1)(1998)(limiting liability to defendant's "degree or percentage of the negligence or fault", without defining "fault"); N.J. STAT. ANN. § 2A:15-5.3(c) (West 1997) (referring to defendant's "negligence or fault", without defining "fault"); N.M. STAT. ANN. § 41-3A-1 (Michie 1998) (referring to "ratio of such defendant's fault to the total fault attributed to all persons", without defining "fault"); N.Y. C.P.L.R. 1601 (McKinney 1997) (allocating liability "in accordance with the relative culpability" of persons causing damage); UTAH CODE ANN. §§

40

78-27-39(1), 78-27-37(2) (1998) (limiting liability to defendants' "proportion of fault"; defining "fault" as "any actionable breach of legal duty, act or omission"). (Connecticut and Kentucky base apportionment to intentional tortfeasors on common-law principles, rather than on statutes. See **Bhinder**, 717 A.2d at 208; **Secter,** 966 S.W.2d at 291.)

Needless to say, statutory definitions of "fault" may resolve whether apportionment to intentional tortfeasors is appropriate. *See* **Hutcherson,** 961 P.2d at 452 ("'The legislature defined fault broadly to include all types of fault committed by all persons'", quoting **Thomas v. First Interstate Bank**, 930 P.2d 1002, 1003 (Ariz. App. 1996)); **Veazey**, 650 So.2d at 717 (finding that courts apportioning liability to intentional tortfeasors "explicitly or implicitly, have construed the term 'fault' contained in various provisions of the comparative fault law as encompassing both unintentional and intentional conduct"); **McLean,** 490 N.W.2d at 244 (noting that new statute directs comparison of "fault", rather than comparison of "negligence", possibly changing scope of apportionment); **Harvey,** 1998 WL 679864**,** *3 ("we conclude that the word 'fault' as it appears in the statute was intended to include a broad range of blameworthy conduct, including intentional torts"); **Field**, 952 P.2d at 1080 ("we find that [the statutory] definition of 'fault' encompasses both negligent and intentional

41

conduct"); **Welch**, 952 P.2d at 634 ("the statutory definition of fault does not include intentional acts or omissions").

But, again, the explicit statement in § 85-5-7(1) that "fault" does *not* include intentional torts correspondingly resolves the issue presented by the Mississippi statute. Therefore, the exclusion of the assailants from the verdict form and omission of their share of fault was proper.

## III.

Accordingly, that portion of the judgment as to liability is **AFFIRMED**; that portion as to damages is **REVERSED**; and this case is **REMANDED** for a new trial only on the issue of damages.

*AFFIRMED in PART; REVERSED in PART; and REMANDED*