United States Court of Appeals,

Fifth Circuit.

No. 94-60492.

James C. SATCHER, Plaintiff-Appellee,

v.

HONDA MOTOR COMPANY, et al., Defendants-Appellants.

May 30, 1995.

Appeal from the United States District Court for the Southern District of Mississippi.

Before POLITZ, Chief Judge, REAVLEY and BARKSDALE, Circuit Judges.

REAVLEY, Circuit Judge:

The manufacturer and seller of Honda motorcycles appeal for the second time[1] a judgment in favor of a rider who lost his leg in a collision between his motorcycle and an automobile. His vehicle had no leg guards, an omission that plaintiff Satcher claims made the product defective and unreasonably dangerous in a crash. The district court's judgment enforces a jury verdict. We vacate the award of punitive damages and otherwise affirm.

BACKGROUND

Satcher sued three Honda companies (collectively Honda) and obtained a favorable jury verdict awarding him approximately $1 million in actual damages and $2 million in punitive damages. In the first appeal we held that under Mississippi law the recovery was barred because the alleged defect, the lack of leg guards, was

---

[1]*Satcher v. Honda Motor Co.,* 984 F.2d 135 (5th Cir.) (reversing and rendering in favor of Honda), *vacated,* 993 F.2d 56 (5th Cir.1993) (on petition for rehearing remanding to district court).

open and obvious to the ordinary consumer.  We reversed and rendered, reasoning that the case should have never gone to the jury and that the district court should have granted defendants' motion for summary judgment.

A few months after our first opinion, however, the Mississippi Supreme Court made clear that the Fifth Circuit's rule, that an open and obvious product defect could not be a ground for liability, was not Mississippi law.  The Mississippi Legislature also enacted a new statute bearing on product liability.  On rehearing, we vacated the prior opinion and remanded the case to the district court to address these new developments in Mississippi law.

The Mississippi case in question is *Sperry-New Holland v. Prestage,* 617 So.2d 248 (Miss.1993).  The court there approved a risk-utility analysis in products cases, and held that the trial court had not erred in applying that analysis rather than a consumer expectations analysis.  The critical distinction for our purposes is that even if the dangerousness of the product is obvious to a reasonable consumer, the plaintiff can still recover in some cases:

> In a "risk-utility" analysis, a product is "unreasonably dangerous" if a reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product.  Thus, even if a plaintiff appreciates the danger of a product, he can still recover for any injury resulting from that danger provided that the utility of the product is outweighed by the danger that the product creates. Under the "risk-utility" test, either the judge or the jury can balance the utility and danger-in-fact, or risk, of the product.

*Id.* at 254.  The court further made clear that the "patent danger"

or "open and obvious" bar to recovery in products cases is not to be followed in Mississippi:

> Under the "patent danger" rule, "a product that has an open and obvious danger is not more dangerous than contemplated by the consumer, and hence cannot, under the consumer expectation test applied in Mississippi, be unreasonably dangerous." *Toney* [*v. Kawaski Heavy Industries, Ltd.*] 975 F.2d [162] at 165 [ (5th Cir.1992) ] (quoting *Melton*, 887 F.2d at 1243).
>
> Having here reiterated this Court's adoption of a "risk-utility" analysis for products liability cases, we hold, necessarily, that the "patent danger" bar is no longer applicable in Mississippi. Under a "risk-utility" analysis, the "patent danger" rule does not apply. In "risk-utility," the openness and obviousness of a product's design is simply a factor to consider in determining whether a product is unreasonably dangerous.

*Id.* at 256 n. 4. The court further held that Fifth Circuit cases applying the consumer expectations test had incorrectly applied Mississippi law. *Id.* at 256.[2]

The district court subsequently responded with a carefully written Memorandum Opinion and Order on Remand. The court pointed out that the new statute, MISS.CODE ANN. § 11-1-63, § 11-1-65, did not become effective until July 1, 1993 (procedural) and July 1, 1994 (substantive), too late to have any effect on the 1991 trial

---

[2]Some federal judges have had difficulty understanding Mississippi products liability law, including the meaning of comment i of the Restatement (Second) of Torts § 402A (re "consumer expectations"). *See Melton v. Deere & Co.,* 887 F.2d 1241, 1246 (5th Cir.1989) (Reavley, J., dissenting). No Mississippi law controlling this case is "in its infancy," as the dissent characterizes risk-utility submission.

As we emphasize below, the jury has found the product without leg guards to be unreasonably dangerous, and has also found that the ordinary consumer would not appreciate the danger. The majority will not speculate about what a new jury would decide, but we are convinced that Mississippi courts would find nothing in this record to justify ordering plaintiff to retry his case ten years after his injury.

of the Satcher case.  Moving to *Prestage,* the district court read that decision to fault the Fifth Circuit's view of Mississippi law but not to fault the trial court's submission in this case.  While a risk-utility analysis would have been appropriate under *Prestage,* the defendant here requested the consumer expectations instruction that was given and the jury returned a verdict of unreasonable dangerousness.  There being no error and no manifest injustice, the judgment was again entered on the verdict.

DISCUSSION

A. *The Impact of Prestage.*

Honda argues that *Prestage* altered the analysis used in products cases, changing the focus away from consumer expectations for the product to whether the danger outweighs the utility of the product.  Honda contends that the open and obvious nature of the danger is only one factor to consider, and that because the analysis now required is fundamentally different, Honda is entitled to a new trial.  In effect, Honda argues that *Prestage* announced a new common law rule, and that new rule should be applied retroactively so as to afford Honda a right to a new trial.

Both the Mississippi Supreme Court and this court have held that *Prestage* did not change the law.  *Prestage* concluded that in prior decisions the Mississippi Supreme Court "has clearly moved away from a "consumer expectations' analysis and has moved towards "risk-utility.' "  617 So.2d at 253.  It purported to apply a risk-utility analysis adopted in earlier decisions.  *Id.* at 253.  On rehearing the first appeal in our case, we explained that

4

*Prestage* held that "contrary to prior Fifth Circuit opinions and this panel's opinion in the instant case, Mississippi applies a "risk-utility' analysis in products liability cases and has done so since 1987." 993 F.2d at 57. We are not in a position to contradict the Mississippi Supreme Court's own conclusion, as well as that of our own panel, that *Prestage* did not change Mississippi law. It is true, however, that from the perspective of the parties in this case *Prestage* has changed the Fifth Circuit's reading of Mississippi law in that the patent danger of a product is not a bar to recovery. That change is not in Honda's favor, nor does it mean that Honda was prejudiced by the law under which this case was tried.

The Mississippi court has explained to us in *Prestage* that the risk-utility analysis of the danger of a product is the analysis to be used, rather than that of only consumer expectations. Again, this modification of our understanding of Mississippi law does not help Honda in this case, and it will not justify affording Honda a new trial. The modification adds strings to the bow of the plaintiff, not the defendant. In the words of the *Prestage* court:

> [E]ven if a plaintiff appreciates the danger of a product, he can still recover for any injury resulting from that danger provided that the utility of the product is outweighed by the danger that the product creates.

617 So.2d at 254.

In the trial of this case the jury was instructed that Satcher's product liability claim depended upon his proving that "the product was in a defective condition making it unreasonably

5

dangerous to the user."  It was then explained to the jury:

> A product is in a defective condition unreasonably dangerous to the user when it has a propensity or a tendency for causing physical harm beyond that which would be contemplated by the ordinary user having ordinary knowledge of a product's characteristics known to the foreseeable class of persons who would normally use the product.

Acting under that instruction, the jury found for Satcher, necessarily finding that the ordinary user would not contemplate the full propensity or tendency of the lack of leg guards to cause physical harm.  To be sure, users know that motorcycles are dangerous, and they know that the absence of leg guards might add to the chances of harm.  This jury could find, however, that Honda's motorcycles were more likely to cost the rider a leg than the ordinary rider would contemplate.  The evidence reflects experience with motorcycle injuries beyond the contemplation of the ordinary rider.  Since the jury found for Satcher on this issue, it is immaterial whether the utility of the motorcycle without guards would weigh less than that danger.  Satcher prevailed on the first step and need not be concerned with the second step, and a retrial to submit the second step cannot be justified.

B. *Punitive Damages*

The jury awarded and the district court entered judgment for punitive damages of $2 million.  Honda asks that we reverse this award because applicable law and the evidence do not support it.

1. *Preservation of Error*

At the outset we address Satcher's argument that error was not properly preserved on this point.  Satcher points out that Honda did not file a post-verdict motion for judgment under FED.R.CIV.P.

6

50(b). Rule 50(a) provides for the filing of a motion for judgment as a matter of law based on insufficient evidence prior to the submission of the case to the jury. Rule 50(b) provides for a renewed motion (previously known as a motion for judgment notwithstanding the verdict or JNOV motion) after the verdict.

To fully preserve error on appeal for failure to grant a motion for judgment, the moving party must file both a pre-verdict Rule 50(a) motion at the close of all the evidence and the renewed Rule 50(b) motion. An appellant who failed to do so in the district court is not entitled to rendition of judgment in his favor on appeal, but is at most entitled to a new trial.[3]

Honda did, however, move for judgment as a matter of law on the issue of punitive damages at the close of the plaintiff's case and at the close of all the evidence. After the verdict Honda filed a motion styled a "motion for new trial," but it not only argued for a new trial but reurged the motion for judgment, and specifically argued that a directed verdict should have been granted on the claim for punitive damages.

Honda's noncompliance with the rule was little more than failing to style its motion correctly. We excuse technical noncompliance with Rule 50 where its basic purposes have been satisfied. *E.g., MacArthur v. University of Texas Health Center,* 45 F.3d 890, 896-98 (5th Cir.1995); *McCann v. Texas City Refining, Inc.,* 984 F.2d 667, 671 (5th Cir.1993) ("In the past, the Court has

---

[3]*Phillips v. Frey,* 20 F.3d 623, 627 (5th Cir.1994); *Zervas v. Faulkner,* 861 F.2d 823, 832 n. 9 (5th Cir.1988); *Smith v. Transworld Drilling Co.,* 773 F.2d 610, 615 (5th Cir.1985).

been willing to excuse certain "de minimis' departures from technical compliance with Rule 50(b)."); *Bohrer v. Hanes Corp.,* 715 F.2d 213, 216-17 (5th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984). The basic purposes of the Rule are "to enable the trial court to re-examine the question of evidentiary insufficiency as a matter of law if the jury returns a verdict contrary to the movant, and to alert the opposing party to the insufficiency before the case is submitted to the jury, thereby affording it an opportunity to cure any defects in proof should the motion have merit." *Bohrer,* 715 F.2d at 216. We conclude that these basic purposes were satisfied here and that error was therefore preserved under Rule 50.

2. *Whether Satcher Is Entitled to Punitive Damages*

Judgment as a matter of law is proper on an issue if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." FED.R.CIV.P. 50(a). In reviewing the denial of a motion for judgment, a jury verdict "must be upheld unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable men could not arrive at any verdict to the contrary." *Western Co. of North America v. United States,* 699 F.2d 264, 276 (5th Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983).

The law of Mississippi allows punitive damages only in "extreme cases;" they "are not favored in the law and are to be allowed only with caution and within narrow limits." *Tideway Oil Programs, Inc. v. Serio,* 431 So.2d 454, 460 & n. 1 (Miss.1983).

8

"[T]here must be some element of aggression or some coloring of insult reflecting malice, gross negligence, or ruthless disregard for the rights of others." *Illinois Cent. R.R. v. White,* 610 So.2d 308, 320 (Miss.1992). In regards to gross negligence, "punitive damages are ordinarily recoverable only in cases where the negligence is so gross as to indicate reckless or wanton disregard of the safety of others." *Beta Beta Chapter of Beta Theta Pi Fraternity v. May,* 611 So.2d 889, 894 (Miss.1992) (quoting *Belk v. Rosamond,* 57 So.2d 461, 468 (Miss.1952)).

Under these standards, we conclude that Satcher was not entitled to punitive damages. Evidence relevant to this inquiry—the dangers of a motorcycle lacking leg guards and Honda's knowledge of such dangers—can be summarized as follows. While police motorcycles have leg guards, all motorcycles marketed by all manufacturers to the general public lack them. Satcher's theory, therefore, was that Honda's conduct in marketing its products in the same design of every motorcycle marketed in the world to the general public was so extreme or outrageous as to justify punitive damages.

Motorcycle leg injuries are a common and serious problem of which Honda and the industry as a whole are aware. Leg injuries account for a significant percentage of all motorcycle injuries. The concept of protective leg guards on motorcycles has existed since the 1930's. A number of scientific studies, of which Honda is aware, have been conducted over the years regarding the efficacy of leg guards. A British physician, Dr. Bothwell, conducted some

early tests in the 1960's. Two engineers, Arthur Ezra and Harry Peterson, received federal funding to conduct further tests at the Denver Research Institute (DRI). They both testified as experts for Satcher, and were of the view that "robust" leg guards or a reinforced "fairing" should be available on motorcycles, and would have been effective in reducing Satcher's injuries. They believe that all motorcycles lacking leg guards are unreasonably dangerous products. An accident reconstruction expert, Dr. Fogerty, testified to the same effect. Ezra and Peterson worked with Dr. Bothwell on the DRI studies. Dr. Bothwell apparently disagrees with Ezra and Peterson, although the exact nature of the disagreement is not clear from the record.

"Conventional" leg guards or crash bars which are not as strong as Ezra and Peterson recommend are available in kits and are added to police motorcycles. Police crash bars are used in part to hold lights or other accessories needed on police vehicles. Their efficacy as a safety device is the subject of disagreement. Kenneth Harms, a former Miami police chief with experience on the motorcycle patrol and in investigating motorcycles accidents, believes that police crash guards, particularly those used on Harley-Davidson motorcycles, are effective in reducing injuries. Harms conceded that he had no scientific or engineering expertise in motorcycle design. Harley-Davidson has expressly recommended against the use of crash bars on its police motorcycles.

Although certain studies indicate that leg guards are effective, no government in the world has ever required them. No

professional organization that reviews engineering safety standards, such as the Society of Automotive Engineers or the American National Standards Institute, has ever recommended leg guards. Ezra believes that the failure of the federal government to act on his own work was due to a deregulatory environment in government during the Carter/Reagan years and pressure from the industry.

Honda presented two well-qualified experts, John Snider and Warner Riley, who opined that leg guards should not be used because their safety benefits are outweighed by their safety disadvantages, including the possibility of greater upper body injuries. For example, Riley explained that the problem with unpadded robust bars is that they can cause the cyclist to leave the motorcycle and land upside down, and that padded crash bars increase in-flight whiplash, which can result in a broken neck. They were also of the view that in this particular accident Satcher would not have benefitted from crash bars. There is a disagreement in the scientific community as to whether head impact increases when crash bars are used.

Honda itself conducted certain crash tests in the 1960's. One report concluded that at certain speeds crash bars are effective at reducing leg impact in an angled collision. However, it found that in broadside collisions "there seems to be an indication that each of the various body area impacts is greater in the case of motorcycles equipped with crash bars than in the case of those which are not," and that a commercially available crash bar "has no

11

protective effect or it has a possible reverse effect in broadside collision[s]."  This conclusion was disputed by Ezra as not supported by Honda's own experimental data.  The report also noted that it was far from definitive.[4]  A Honda chief engineer testified that "thus far we have created, tested, evaluated various experimental devices;  however, we have yet to come up with a ... practical as well as effective device that would protect the leg."

Summarizing, the jury heard evidence that (1) there is a genuine dispute in the scientific community as to whether leg guards do more harm than good, (2) no government or agency thereof has ever required them, (3) no independent testing or professional organization has ever recommended them, (4) one of the original researchers on the problem who worked with two of plaintiff's experts disagrees with them, (5) the industry as a whole categorically rejects the need for leg guards, and (6) Honda's own testing on their use reached no definitive conclusions.  On this record we hold that no reasonable jury could conclude under Mississippi law that this is an "extreme case" meriting punitive damages, or that Honda's conduct rose to level of "malice, ruthless disregard or gross negligence" required for the imposition of such

---

[4]It states in its preface:

> To judge the propriety of equipping motorcycles with crash bars, we must, as described later, have the cooperation of many other studies.  The present test is by no means satisfactory;  it is a mere fragment of the long-term test program extending over the future. Therefore, a definitive conclusion cannot be drawn from the present test results;  however, our approach to the elucidation of effect of the crash bar is to be carried on for the improvement of motorcycle safety.

damages.  We therefore vacate the award of punitive damages.

C. *Evidentiary Rulings*

Honda complains of several evidentiary ruling by the court. "Under [FED.R.EVID.] 103(a), appellate courts should reverse on the basis of erroneous evidentiary rulings only if a party's substantial rights are affected.  Moreover, the party asserting error based on erroneous rulings bears the burden of proving that the error was harmful." *Carroll v. Morgan,* 17 F.3d 787, 790 (5th Cir.1994) (citation omitted).

Honda complains that Kenneth Harms (discussed above) should not have been allowed to testify as an expert on lower leg protection.  "A trial court's ruling regarding admissibility of expert testimony is protected by an ambit of discretion and must be sustained unless manifestly erroneous." *Christophersen v. Allied-Signal Corp.,* 939 F.2d 1106, 1109 (5th Cir.1991), *cert. denied,* 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992).  Honda argues that Harms is not an engineer;  however FED.R.EVID. 702 allows that a witness may be qualified by "knowledge, skill, experience, training or education."  The district court did not manifestly err in finding him qualified to testify as an expert.  Among other qualifications, he was on the Miami police motor squad for approximately nine years, and has investigated hundreds of motorcycle accidents.  Further, Honda does not demonstrate that its substantial rights were affected.  Harms' testimony regarding leg guards was cumulative of the testimony of three other experts on this subject, and he was thoroughly cross-examined regarding his

13

lack of formal scientific and engineering training.

Honda next complains that the testimony of Ezra and Peterson regarding the severity of Satcher's injuries if a crash bar had been installed was speculative or lacking in scientific certainty. We fail to see any error here. Both experts were highly qualified. Both testified that with proper leg protection Satcher would not have lost his leg, and Ezra testified that he might have suffered no more than a bruise. The testimony was properly allowed.

Honda also complains that the court erred in not allowing its experts to change or modify at trial their opinions given in pretrial discovery that the accident occurred in Satcher's lane. The experts agreed before trial that the collision occurred in Satcher's lane, in part because an eyewitness and the police officer who investigated the accident had given statements supporting this conclusion. These two individuals then gave different testimony at trial, suggesting that the collision might have occurred in the automobile's lane. The district court reasoned that it would be unfair to allow the experts to change their testimony after discovery. Honda argues that this issue is relevant to Satcher's contributory negligence and assumption of the risk. While the lane in which the accident occurred is certainly relevant to contributory negligence, Honda fails to show that its substantial rights were affected. The jury heard from Satcher, the eyewitness and the police officer at trial. The jury hardly needed expert testimony to explain that driving in the wrong lane of traffic is negligent. As to the question of which lane the

14

accident occurred, Honda fails to explain how expert testimony would have significantly bolstered or discredited the testimony of the lay witnesses.

Finally, Honda complains that the district court erred in failing to submit a jury issue on assumption of risk. The court did submit instructions on contributory negligence. In *Braswell v. Economy Supply Co.,* 281 So.2d 669, 677 (Miss.1973), the Mississippi Supreme Court held that where contributory negligence and assumption of risk overlap and coincide, the defense of contributory negligence applied. "If the circumstances show that the plaintiff may have assumed the risk but also indicate that the plaintiff may have been negligent without assuming the risk, then the two doctrines overlap, and only the comparative negligence instruction should be given." *Richardson v. Clayton & Lambert Mfg. Co.,* 657 F.Supp. 751, 754 (N.D.Miss.1987). The court did not err in refusing to submit the assumption of risk instruction.

The award of punitive damages is vacated and in all other respects the judgment is affirmed.

AFFIRMED IN PART, VACATED IN PART.

RHESA HAWKINS BARKSDALE, Circuit Judge, dissenting in part and concurring in part:

"Spur not an unbroken horse; put not your plowshare too deep into new land." Sir Walter Scott, *The Monastery [1820]. Answer of the Author of Waverley to the Letter of Captain Clutterbuck,* ch. 25. Even though this matter is governed by entirely new ground rules, the majority refuses to remand it for a new trial. Accordingly, I respectfully dissent from that part of its opinion

15

(part A;  "*The Impact of Prestage* ");  in all other respects, I concur.

The Mississippi Supreme Court's fairly recent holding in *Sperry-New Holland v. Prestage,* 617 So.2d 248, 253-56 (Miss.1993), that "risk-utility", rather than "consumer expectations", is, and has been since 1988, the relevant analysis for Mississippi strict product liability was, to say the least, most unexpected.[1]  *See, e.g. Batts v. Tow-Motor Forklift Company,* 153 F.R.D. 103, 106 (N.D.Miss.1994) (observing that with *Prestage,* "the Mississippi Supreme Court let the rest of the world in on the best kept secret in Mississippi jurisprudence").  But, *Prestage* provided only a broad statement of the law of Mississippi;  and, for the reasons set forth below, I cannot join in the majority's application of this analysis, still in its infancy in Mississippi, to justify not holding a new trial.

The majority has concluded that a new trial is not justified, apparently because Honda would have no reasonable chance of success under the risk-utility analysis.  I cannot agree.  To date, there are no published cases in Mississippi either applying, or further defining, the *Prestage* analysis.[2]  This alone gives pause to the

---

[1]The author of the majority opinion is one of the few who previously questioned Mississippi's adherence to the consumer expectations test.  *See Melton v. Deere & Co.,* 887 F.2d 1241, 1246-47 (5th Cir.1989) (Reavley, J., dissenting).

[2]Not only are there no cases expounding *Prestage,* there are also no Mississippi cases detailing the analysis of the cases on which *Prestage* relied:  *Whittley v. City of Meridian,* 530 So.2d 1341 (Miss.1988), and *Hall v. Mississippi Chemical Exp., Inc.,* 528 So.2d 796 (Miss.1988).  Indeed, one court has observed that between 1988, when Mississippi is said to have adopted the

16

majority's conclusion that Honda would necessarily lose under risk-utility. Furthermore, to the extent *Prestage* can be clearly understood, I am troubled by the majority's application.

As stated in *Prestage,* the proper inquiry in Mississippi for a strict product liability claim is whether "the danger-in-fact ... outweighs the utility of the product". 617 So.2d at 254. But, the Mississippi Supreme Court provided little, if any, guidance for making this inquiry, stating only that, "[i]n balancing a product's utility against the risk of injury it creates, a trial court *may find it helpful* to refer to the seven factors enumerated in Professor John Wade's article, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825." *Id.* at 256 n. 3 (emphasis added). Those factors are:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.
>
> (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.
>
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.
>
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
>
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.
>
> (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of

---

risk-utility analysis, and 1993, when *Prestage* was decided, at least one Mississippi Supreme Court case implied that the consumer expectations test was still applicable. *See Batts,* 153 F.R.D. at 108-09 (citing *Kussman v. V & G Welding Supply, Inc.,* 585 So.2d 700, 703-04 (Miss.1991)).

general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Id.* The majority seems to have found one of the above factors, number six, to be dispositive, stating:

Acting under [a consumer expectations] instruction, the jury found for Satcher, necessarily finding that the ordinary user would not contemplate the full propensity or tendency of the lack of leg guards to cause physical harm.... Since the jury found for Satcher on this issue [consumer expectations], it is immaterial whether the utility of the motorcycle without guards would weigh less than that danger. Satcher prevailed on the first step and need not be concerned with the second step, and a retrial to submit the second step cannot be justified.

By the foregoing, I understand the majority to conclude that the jury's finding on consumer expectations trumps, even under the risk-utility analysis.[3] This runs contrary to even the minimal guidance offered by *Prestage.*

In light of the seven factors *suggested* by *Prestage,* a consumer's awareness of the danger inherent in a product is but one factor to consider in the risk-utility analysis. *See also Prestage,* 617 So.2d at 256 n. 4 (rejection of "patent danger"

---

[3]It seems more than somewhat anomalous to give credence to the jury's verdict for Satcher under the consumer expectations test, when, on appeal from that verdict, our court found that, under this (consumer expectations) analysis, Honda was entitled to judgment as a matter of law; accordingly, we reversed and rendered judgment for Honda. *Satcher v. Honda Motor Co., Ltd.,* 984 F.2d 135, 138 (5th Cir.), *vacated,* 993 F.2d 56 (5th Cir.1993). Our court vacated its opinion, not because of a change of heart regarding Honda's entitlement to judgment under the consumer expectations analysis, but because *Prestage* revealed that consumer expectations was no longer the test in Mississippi. *Satcher,* 993 F.2d at 57-58.

18

rule).  Moreover, *Prestage* held that foreseeability of danger was not dispositive:  "In determining whether a product is unreasonably dangerous a reasonable person must conclude that the danger-in-fact, *whether foreseeable or not,* outweighs the utility of the product."  *Id.* at 255.  (emphasis added) (quoting *Whittley v. City of Meridian,* 530 So.2d 1341, 1347 (Miss.1988)).[4]

Rightfully so, the majority does not undertake to predict the outcome in this case when all of the suggested factors for risk-utility analysis are applied.  With almost no guidance on risk-utility from the Mississippi courts, we cannot forecast how a jury might weigh the factors and evidence here.  The majority notes correctly that the risk-utility analysis "adds strings to the bow of the plaintiff, not the defendant" but, as noted, a panel of this court held that, as a matter of law, Honda *prevailed* under the consumer expectations analysis, and that holding was vacated only because *Prestage* signaled that consumer expectations was no longer

---

[4]*Prestage* reads:

> In a "risk-utility" analysis, a product is "unreasonably dangerous" if a reasonable person would conclude that the danger-in-fact, *whether foreseeable or not,* outweighs the utility of the product.  Thus, even if a plaintiff appreciates the danger of a product, he can still recover for any injury resulting from that danger provided that the utility of the product is outweighed by the danger that the product creates.

*Id.* at 254 (emphasis added).  The *Prestage* court made this statement as a comparison between risk-utility and consumer expectations—noting that, with risk-utility, unlike consumer expectations, the plaintiff does not automatically lose only because he "appreciates the danger of a product".  Of course, the court did not mean that the opposite was true.  *See Id.* at 254, 255 n. 3 & 4.

19

the test in Mississippi. *See* note 3, *supra.* To hold now that Honda necessarily *loses* is a leap I cannot take.

The risk-utility analysis hardly leaves Honda with no "strings in its bow". For instance, perhaps it could make a case for the high utility of motorcycles in general. For another example, and as to the design at issue, Honda offered evidence that the addition of leg guards, although offering greater protection against the injury suffered by Satcher, might actually increase the likelihood of fatal injury—an obvious important factor in a risk-utility analysis. Does this mean Honda will prevail? I would not—and, indeed, cannot—hazard a guess. I note only the obvious: the ground rules have changed dramatically in Mississippi, and those rules have yet to be defined with any precision. As such, I cannot agree with the majority that it would be unjustified to permit the parties to present their cases to the jury under the proper legal standard. To the contrary, in my opinion, justice requires it.

Accordingly, I must regretfully, but most respectfully, dissent.